Good afternoon, ladies and gentlemen. We will take the only case in the order in which it appears on the calendar. Your Honor, as a preliminary matter, I'd like to explain. I have given some of my time to the amici, and Mr. Fleming will speak first for seven minutes. Ms. Hudson-Price will speak for the next seven minutes. Mr. Sadie will speak for the next seven. I would then take six, though I am going to reserve some for rebuttal. And Ms. Rowland would be taking three minutes and maybe some of my time on rebuttal. And that's where we divided it up. And Anne Hudson-Price is not happening? There's another name on here, but I gather that person is not happening. She is, Your Honor. She will speak after me for seven minutes. I see. Okay. Good afternoon, and may I... It would be mildly helpful if each of you told who you are representing. Absolutely, Your Honor. May it please the Court. My name is Mark Fleming, and I represent the amici Immigrant Defense Project and the National Immigration Project of the National Lawyers Guild. As Mr. Cook explained, the amici have divided time, but all the amici counsel who will be speaking today are speaking on behalf of all the amici who have supported the appellant. In United States v. Williams, one of the examples the Supreme Court gave of speech protected by the First Amendment was the sentence, I encourage you to obtain child pornography. But the statute at issue in this case makes it a federal felony to say, I encourage you to remain in this country if the speaker knows that the listener is undocumented. Of course, it remains quite lawful to say to such a person, I encourage you to leave this country. The First Amendment's protections are at their strongest when the government criminalizes expression based on content and viewpoint, and this provision does exactly that. It is not like the conduct-based prohibitions elsewhere in the statute, nor is it like the actual aiding and abetting provision that figures only two subparagraphs later. Rather, this provision picks a side in a national debate and criminalizes opposition to the government's desired message. That's unconstitutional, and the government doesn't have much of an argument on the constitutional merits. Instead, it raises two points. First, they argue waiver, and second, they try to perform, or they invite the court to perform, radical surgery on the statute, and neither approach is valid. Excuse me one minute. I should have said before you started that the government in its response, or in its brief that we requested, also emphasized heavily the financial aspect of this, not just the basic section, but the following section, which makes it a more serious crime to do it for compensation or for financial reasons. We didn't put that in our list of things to discuss, but I think that was our fault. But the government did respond and rely heavily on that, so whoever, any of you, all of you on your side should comment on that certainly as well. Thank you, Judge Reinhart. I think my colleagues certainly will comment on that. I mean, I'd say we haven't briefed it, but our position on that is that that additional provision, while it affects the penalty that may be afforded for the particular violation, it doesn't change the nature of the element of the crime. Well, no, I think in this case it's an element of the crime. Yes, Your Honor. Also, it does more than affect the penalty. In other words, you have to do it for a commercial purpose. Does that make a difference to your argument that, you know, any statement is unconstitutionally broad? I don't think so. If the government has to prove that specific intent? I think if the government wants to get the added sentence, the additional penalty, it does need to prove that. I don't think it changes the fact that the underlying conduct that's prohibited by A1A4 is a viewpoint discriminatory content-based regulation of speech because it makes it unlawful to encourage someone else, which is an act of speech. I would start, if the Court pleases, with the waiver point because it is something that comes up repeatedly in the government's brief, and I don't think it should detain the Court long, so I'd like to just get that out of the way. It's very clear, at least from my reading of both the motion to dismiss and the opening brief in this Court, that the defendant did argue that the crime alleged here is based on the content of her speech and it's presumptively invalid and it triggers strict scrutiny. Whether she used the words content-based or viewpoint discriminatory we think is unimportant, and I think the best authority for that is the Citizens United case in the Supreme Court where the plaintiff had only raised an as-applied challenge, but the Supreme Court said that the facial challenge that was eventually the basis of the decision was simply another argument that supported the First Amendment claim. Well, is waiver a categorical doctrine or is it a discretionary? It is not, Your Honor. The second point I was going to make, it is a discretionary doctrine, and one of the situations in which this Court has recognized in the Ruiz case, for instance, that the Court can overlook it is when the issue presented is purely one of law, and the First Amendment issues we're discussing today certainly qualify. I think the government takes the position that if we reach any of these questions in spite of the waiver that the government raises, then the review is plain error. Does that make a difference? We don't think that plain error is the right lens through which to view it, just as in the Citizens United case the Supreme Court reviewed the issue plainly as a constitutional matter without regard to the plain error because the First Amendment objection had been preserved all the way up as it has been here. The main argument that the government offers, Your Honors, on the merits is an effort to rewrite the statute so that it becomes an aiding and abetting provision and that the crime in their view is aiding and abetting an immigration violation. We'd submit that's wrong for at least four reasons. First of all, the statute itself doesn't say aiding and abetting anywhere. It could have. Congress knows how to write an aiding and abetting provision, and it did so just two sub-paragraphs later. There's also no basis for using nascotura socis here. All the other terms that the government relies on are not from this provision. We're not talking about neighboring words. We're talking about other provisions. Can you explain to me what I'm asking you to explain the opposing argument? As I read their briefs, essentially they read a bunch of limitations into the statute, but what do you mean by saying that they said it was only aiding and abetting? Aiding and abetting what, first of all? Not just a criminal act. No, entirely not, Your Honor. I think that's a critical point. Their position is it's supposedly aiding and abetting a civil immigration violation, which is not a crime. And that is something that, as far as I know, they don't cite any other provision comparable to this where Congress has criminalized as a felony the aiding and abetting of a civil violation. The only cite they have for that proposition is a statute from the state of Maine about giving alcohol to a minor. So they're saying is aiding and abetting just a verbiage, or does it change the substance of what? What I understood them to be saying is, first of all, they said you have to be, as they read the statute, you have to be encouraging a specific individual, and it can't be a group. They said sort of. They said it kind of has to be an act and not just speech, but when they quoted what they were saying, they seemed to be talking about speech. They, I'm not sure what else. I mean, they just seemed to be adding a lot of thought. So there's a lot in that question, Judge Berzon. I want to try to address all of it. So first of all, they didn't say it has to be a particular individual. They say very carefully, a particular alien or aliens. So it can be a group. I think the only exception they would admit is if it's speech presented somehow to the general public. But I assure you that if any of my clients are giving a presentation to 10 or 20 people about understanding their rights, I would imagine the government would take the position that that's not to the general public, but to a group of people. I'm presenting to three judges of the Ninth Circuit, but I'm likewise presenting to each of you and hoping to convince each of you individually, and that's typically the situation in many of the circumstances that we're worried about being chilled based on this statute. I think the careful... You're about to reach eight minutes. I am, Your Honor. I don't want to cut you off. Take another minute or so. Thank you, Your Honor. I appreciate it. I just want to complete the point about why I think the aiding and abetting analogy doesn't work completely in addition to the point which I endorsed that was the premise of Judge Berzon's question, which is it requires weeding in a lot of language that Congress just didn't use. But also it's important to note that the government itself does not envision this provision acting like an aiding and abetting statute. If you have an aiding and abetting statute, there has to be some kind of act in furtherance of the offense. But they say, it's buried in a footnote, but it's footnote three on page nine of their supplemental brief, that even a mere offer of assistance is a crime, even if no help is actually given. That makes clear the felony here isn't aiding or abetting in terms of doing an act. It's the speech, which is merely giving an offer of assistance. Also, criminal aiding and abetting requires that there actually be a principal who commits the offense. But the government takes the position that it doesn't matter whether a violation of the immigration law actually happens. All you have to do is encourage someone to do it, and then the crime is complete. That's on pages 22 to 23 of the supplemental brief. Also, it's a complete about-face with how they've argued this case in the past. Thank you, Your Honor. I appreciate it. Good afternoon, Your Honors, and may it please the Court. Annie Hudson Price on behalf of Amicus Public Counsel. There are three points I would like to briefly address this afternoon regarding the statute's overbreath. First, it is substantial. Second, it is incurable. And when I address this point, I would also like to briefly touch on a question Judge Berzon raised in the last oral argument that went unanswered regarding exactly what intent the statute requires. And third, the chilling effects of this statute are not only realistic, as the Supreme Court has required, they are known. So first, the overbreath is substantial. This is clear both because the plain meaning of the statute prescribes an alarming amount of protected speech, and because the penalties it imposes are severe. There are over 10 million undocumented immigrants that currently reside in the United States. Every day they interact with members of their communities, not just attorneys, but doctors, social workers, teachers, neighbors, nurses, who risk felony prosecution and 5 to 10 years in federal prison for speech that, although perfectly true, has the effect of encouraging an undocumented immigrant to continue to reside here. For example, under the plain meaning of the statute, a teacher cannot tell – it would be unlawful for a teacher to tell a parent, the public school cannot refuse to enroll your child because she is undocumented. Is that – is your statement true regardless of the intent with which that speech is made? And I think this goes to – State of mind? Yes, I think this goes to Judge Berzon's question, the last oral argument, which was, what intent does this require? Does it require intent to encourage, intent to violate the immigration laws, intent that someone else violates the immigration laws? At least on some of the other subsections of the statute, I think we have law that says it requires an intent to encourage violation of the immigration law. And that, Your Honor, is protected speech. Nothing in that meets a requirement that excuses that speech from protected speech. You can't save a statute that criminalizes abstract advocacy by requiring you intend to abstractly advocate, which is what the government is asking you to do here. In fact, the government doesn't even contend there is a MENFREA standard. Well, even that – what do you mean by abstractly advocating? I mean, suppose I say to a particular person with the intent that they stay here, you know, you really shouldn't – even though you're here illegally, you shouldn't leave because you couldn't – it'll take five years before anybody deports you. I mean, that's not abstract advocacy. Well, under the Brandenburg incitement test, there must be a specific intent that someone else – Well, maybe there is a specific intent. It's my child that I don't want her leaving, I'm telling you. I want her to stay here, and you ought to because nothing terrible is going to happen to you for five years anyway, so stay here. Well, and then it must be imminent – there must be an imminence requirement there as well. And how do you imminently continue to reside here? There's no real – I mean, it doesn't make sense. How can you imminently get someone to continue to reside in the United States? Brandenburg requires that there be both an imminence, a specific intent that someone engage in a certain abject advocacy, and a certain – There's a problem that Brandenburg – none of those cases deal with non-criminal acts. Certainly. Isn't that the real core of the problem here, that people – ordinarily, with regard to non-criminal acts, people can make decisions whether to comply or not and take the consequences. I mean, if you're a business person and you say, you know, if you fire this person, you're going to be in violation of Title VII, and they say, I'm willing to take the chance because, you know, it'll take a long time until it resolves itself. Is that illegal advice that could be made a crime? Well, let's just – I don't know. Maybe it could be made a crime. Has it ever been made a crime? Has anything like that ever been made a crime? Not that we're aware of, Your Honor. And the fact that this statute does touch on civil violations – It doesn't touch on it. It touches the court. It explicitly – thank you, yes. It explicitly prescribes continued residence in the United States. And I think it's important – I mean, in New York v. Ferber, the Supreme Court emphasized that the penalties to be imposed are relevant when determining whether or not overbreadth is substantial. In Houston v. Hill, the Supreme Court similarly emphasized that when a statute imposes criminal sanctions on protected speech, it must be examined with particular – But could we read the statute as only dealing with encouraging people to commit crimes, i.e. return after having been deported or something like that? Well, I – are you asking if that would resolve it? Well, I'm not saying it would resolve it, but could we limit it that way? No, Your Honor, because the plain – with all due respect, the plain language of the statute – in 1986, they explicitly added the phrase, or reside. And residents of the Supreme Court and other courts have repeatedly held that criminal – that remaining in the United States is not a criminal offense. I also want to emphasize that the construction that the government proposes itself does not resolve this statute. As my colleague – as Mr. Fleming began to touch on, first of all, they themselves have not been able to come up with a consistent construction of this statute. In their initial brief, the government took the position that this court had already determined, in U.S. v. Thumb, that encourage should be interpreted literally to mean – and they quoted U.S. v. Thumb to mean to inspire with courage, spirit, or hope. Citing that affirmatively, they determined that that meant she had violated the statute because she inspired her clients with hope. Now – and the court – the government also cited a number of circuit court decisions to the proposition that this statute has been interpreted broadly and that it touches on statements and actions. Now they're asking this court to ignore that, to find the Thumb language dicta, and to instead to sue this to require – and they, in fact, ask you to replace the word encourage with eight words that completely change its meaning, to knowingly undertake a non-de minimis act that could assist. Those words alone do not resolve this. But what kind of an act? I'm sorry. A non-de minimis. Oh. And the reason that is problematic is, for example, what does non-de minimis mean? The government itself cites the Henderson case for the proposition that this only touches on non-de minimis acts. But the Henderson case itself, the court described the encouragement as de minimis. So this is all at the discretion of the prosecutor, what is considered de minimis and what is not. Similarly, the government in that same case – and I'm quoting, and this is why this case is of particular concern to myself and my colleagues, is it touches on attorney and advocacy speech. In the Henderson case, and I'm quoting, the government professes the statute is broad enough to permit prosecutions of immigration lawyers for advising illegal aliens regarding the circumstances – You can have about one more minute. Thank you, Your Honor. And that point, that does also go to the fact that this question of whether or not the enhancement offense of criminal – of doing it for commercial purposes. For an attorney, it doesn't matter whether it's for commercial purposes or not. That speech is protected. So whether or not it's for commercial purposes does not resolve the First Amendment issue. It's not commercial speech, in any event, because it's not promoting. Exactly. It's not proposing commercial purposes. Exactly, Your Honor. And is that the answer for their Pittsburgh plate glass site? That is one of the answers, Your Honor. I think in that case, as we submitted in our – as the federal defender submitted in response, that case is inappropriate for a number of reasons. I do also want to briefly touch on the fact that the chilling effects of this statute are not only known, they are quite perverse in that they, while chilling attorneys who are interested in representing immigrants might be chilled from doing so, it incentivizes and pushes unrepresented immigrants into the arms of unscrupulous immigration consultants, like the kind the government professes to be going after today, those who are not going to be deterred because of a law like this. So the chilling effects not only decrease protected speech, it increases bad faith fraudulent speech, which is – and to remind the court, as Judge Burzum pointed out at the last oral argument, fraud is nowhere in the text of this statute. And the government's asking you to read all of these provisions into the statute is a rewriting, not a construction. Thank you, Kansas. Good morning. Good morning. Afternoon. May it please the court. Thank you for inviting the federal defender organizations to comment on a statute that has real-world and immediate effects on our staffs and our potential clients. Encourage and induce section of this 1324 is unconstitutionally vague because it has too indefinite a description of crime. But the word encourage appears in other criminal statutes, does it not? It does. And is your problem with it an extent to all those statutes? It extends to any situation where it is not coupled with other easily applied rules of statutory construction to give it meaning. Here we have a statute with no definitional sections. They're not using any kinds of qualifications of very expansive words, induce or encourage, and there's no specified mens rea. Here what the government has done is gone from its opening brief that says, hey, this is a simple brief, this is a simple statute, easy to decide what's, just go to the dictionary for what's encouraged, and now in the supplemental, I'm counting eight elements, including this non-de minimis, which from a vagueness point of view I think is a critical point. Because already, as we've pointed out in our brief, these words are extremely broad. So now we have an extremely broad statute, and we have individual ICE agents in Los Angeles, in Montana, in Seattle and in Portland deciding, oh, is this de minimis, or maybe it's not de minimis. Has any court outside of the context of the statute ever held that the word encourages an unconstitutional either vague or violation of free speech? In the context of a criminal statute, a naming and abetting or accomplice type statute. I'm unaware of it being used in a way where it is isolated as it is here with only one other word that is also subject to very broad interpretation under dictionary and this court's own adoption of dictionary definitions. So it's coupling with other types of statutes where it includes specific aiding and abetting, that type of thing, where it is given context in the statute, perhaps. But in this situation, we have a stand-alone, a stand-alone that is extraordinarily broad, and a stand-alone that does not have any way of... Is it a crime or isn't it a crime? Even in the statute. So if you couldn't fix it, if you said it only applies to... Like Gene Volokh's amicus brief assumed that it only applied to immigration criminal violations. That's exactly right. It doesn't say that. Nobody else seems to think it, but it wouldn't satisfy you anyway. No, because the underlying words, the operative words are so broad that it covers... It gives to the individual prosecutors and the individual law enforcement too much discretion to decide about what constitutes a crime, and then once it constitutes a crime, it's so broad, then you have the chilling effect where people are going to be afraid of doing what they need to do in terms of, for example, lawyers and investigators who represent undocumented folks who are in contact with friends, family, employers, supporters, and they have to be constantly on guard for whether they are committing a federal crime that will subject them to years in prison, stigma, and at best, if they have to fight their way out of it, it means that they're going to be burdened for a very substantial time. This is an extremely difficult type of overbreath that combines with the vagueness that means the statute should be stricken. But there are, for example, solicitation statutes that make it a crime to persuade or I think the word often used is persuade. Is that right? That's just solicitation. Solicitation when it's tied to a concrete offense, and that's why I think we have... But what I was going to say about that is I presume a lawyer, I mean, would not be taken to have solicited a crime because he was consulted as to whether it was a crime or not and told it was a crime. I would disagree, and that's because the district judge in Henderson says, the government professes the statute is broad enough to permit prosecution of immigration lawyers for advising illegal aliens regarding the circumstances under which they may perform adjustment of status. Maybe here in L.A. we have somebody who's going to be reasonable about a prosecution. Here's a government representation in court to a judge bringing that type of situation up, and that's why I do want to quickly respond to the... This is the core statute of Subsection 4. The fact that there is a sentencing enhancement is irrelevant to the vagueness of the basic statute. It's completely analogous to... For one thing, you could be convicted of Subsection 1 and not Subsection 2, and they have to mean the same thing for both purposes, and you're not going to start changing the meaning of the basic crime depending on whether the ultimate sentencing is on 1 or 2, right? Exactly, and it's very analogous to the situation we saw in Blakely where you have a core statute and then you have if it was done for a discriminatory reason. So if you had the Coates case where they said it's vague because we don't know what annoy means, if you had an enhancement for money or for discrimination, that would make it irrelevant to the fact that the underlying crime, the annoying, was overly vague. Thank you. Thank you, Kevin. May it please the Court, I'm Daniel Cook on behalf of the appellant. I'm going to speak to simply the due process fair notice issue. In this case, the statute's words aren't plain. There's no legislative history that's relevant that provides any gloss to it. There are no government publications, either by the Department of Justice, INS back before the day of CIS or ICE, talking about limitations on what a person can do to assist an alien in filing an I-140 petition or a labor certification. But we do have evidence in this record that the Department of Labor granted thousands of such labor certifications to aliens who were in the similar circumstances as these two here, present unlawfully, working unlawfully. Now, she may have told them other things that weren't true. The allegation is that she told her clients, she gave them assurances that weren't true, that weren't valid. Which relates to the fraud issue, but those assurances that those people testified to happened in 2002. And the labor certification was approved. What the government is doing is taking... Except she was convicted of fraud separately. Separately. And that's the 2002 period. In 2007, she is... a labor certification is obtained for each of the aliens. The employer says, and it's the employer's application for the I-140, I want to take the next step for my employee. Ms. Zenetting-Smith is retained solely for the purpose by the contract of filing that petition on behalf of the employer. The contract says, I am giving you no advice. You want any advice, you can go to a lawyer, you can ask your employer. The testimony is there were no communications in 2007 in regards to the I-140, orally, between the alien and Ms. Zenetting-Smith. The single day charged is the day each alien, and in one case the employer also, signed the retainer agreement. The day charged, and it's not a continuing offense, is not even the day that you have a completed contract. So what is the encouragement and inducement here? Even if you put the government's gloss on it of a substantial act that's not de minimis and is an affirmative act. The affirmative act is sending a form on behalf of the employer, if they wish to do it, to I will agree to be retained to file that petition. That's the conduct. What happened five years earlier is not the conduct. The new gloss, as Mr. Sadie said, the government's putting on this, comes nine years after the charge of offense of 2007. The government's whole position in front of Judge White was, this is a unique case. I called it a test case. And then they said, well, it's covered because she had told them that they could work or they had a chance to get a green card when they weren't currently eligible five years earlier. And I kept trying to point out, how does that relate to what's happening five years later? Especially since in the same applications in the exhibits in volume six of my excerpts, an additional piece of paper was sent that talked about- We'll give you one more minute. Additional information was presented that you may not be eligible in the charts that are submitted as part of the exhibit and that Judge White referred to. You might not be eligible for those if there's not a change in the law. And that could take five years or more. So what is the affirmative act that's substantial and not diminished, she did, and how was she, back in 2007, on fair notice that that's the gloss of the statute? Because if you apply even that gloss, it still applies to any- In this case, it's financial gain, but encouragement doesn't require that. It's an additional element to get the increased offense. But any lawyer, still, and I say it again, any lawyer, immigration consulting or anybody else, charitable organization, whether being retained for financial gain or not, is inferior to prosecution under the statute. And the limitations the government proposed don't cover that and protect that, and I don't think it's within the scope of the statute, nor has anybody like my client ever been on fair notice. Especially since it was also shown in trial that Ms. Sinning-Smith had hundreds of labor certification and I-140 applications approved by either the Department of Labor or the INS. And in those, she disclosed they had overstayed and they were in the country. Thank you. Thank you, counsel. All right, well, I think you're on. You look a little lonely over there. Good afternoon. May it please the court. Liza Collery on behalf of the United States. I'd like to begin by briefly addressing the waiver point, and then I'll move on to talk about what the government believes encouraged means in this statute and why it does not render the statute unconstitutionally overbroad. On the waiver point, the fundamental question that the court's supplemental order asks is whether the statute is overbroad under the First Amendment. That is a claim- Or vague. Or vague. I believe the vagueness issue has standing problems, because the defendant can only raise vagueness as to her, and her vagueness argument is very weak. But let me just talk first about the overbreadth issue. On the overbreadth issue, the defendant at no point in the district court or in this court has ever raised a First Amendment overbreadth argument. To the contrary, the argument the defendant presented to this court, the very first argument in his brief, was that the statute at issue was exceptionally narrow. It was so narrow that it only applies to fraud schemes against the government. The amici have now come in and said, this statute is exceptionally broad. It's capacious. And in fact, the purpose of this statute is to promote viewpoint discrimination and to interfere with free debate about immigration. I have a question of what the purpose of the statute is. That's not the question. The question is how it could be read. The scope of the statute. So the defendant not only never raised overbreadth, the defendant's argument is fundamentally inconsistent with overbreadth. And we believe for that reason that this is just the wrong vehicle in which to consider an overbreadth argument. The overbreadth argument has been waived by the defendant and is inconsistent with the argument that he's raised before the court. There's also the issue of the enhancement, the fact that to convict her of the crime she was charged with, the government needed to prove that it was done to her. This is why it doesn't seem consequential to me. Aside from whether it actually matters that there is a financial hook for First Amendment purposes, leaving that aside, the basic statute applies whether there is or isn't a commercial hook. Right? That's true. And therefore, it needs a uniform interpretation. So whatever it means, it doesn't mean something different depending on whether there is or isn't a commercial hook. Yes, but for purposes of the First Amendment analysis, it can matter. Whether you have a purpose of private financial gain can matter for First Amendment analysis. And that is why it would be more appropriate to consider these overbreadth arguments in the context of a case that didn't involve that problem. For example, under the Alvarez case, if you engage in, you can engage in false speech that is protected under the First Amendment, but if it is done for a purpose of commercial advantage or for private financial gain, it's fraud and it's not protected under the First Amendment. It's also possible that if you have a... And even if you don't litigate it as fraud. See, that's what's strange about this case. There's no doubt that what she did is cognizable as a crime, but that isn't this crime. That's the problem. Well, it can be this crime. I mean, fraudulent schemes are at the core of what it means to encourage or induce someone. Why? Why does it matter? I mean, it doesn't have any connection in my mind that if you're encouraging somebody, whether you're doing it to fool them or doing it to help them has anything to do with whether you're encouraging them. But it's one way by which someone can encourage. Let me move on. No, it's not really that. It's really they're encouraging them. It's more of a motive. Why in order to fool them? But the encouraging isn't the fooling. Well, in this case, the encouraging was to get people to pay her $200 a month for years on end with the false hope of a green card. And when the vagueness argument was raised in the district court, the only vagueness argument raised in the district court was not a facial vagueness challenge. It was vague as applied to Sinanning Smith. And in response to that, the district court said, that argument doesn't work because promising someone a green card, claiming that you have a path to a green card, is powerful encouragement. Anyone would know that that's powerful encouragement under this statute. And suppose it was true. Suppose they did have a path to a green card and they went to a legitimate lawyer who said, you know, you should stay here a while and maybe eventually I can get you a green card. They're not encouraging them to stay? They wouldn't be encouraging them under this statute. It wouldn't be a crime under this statute. They're encouraging illegal people to stay here. But there is no longer any path to a green card for someone who's already overstayed their visa. So that was just the essence of her scheme. Another example, adjustment of status, cancellation of removal, whatever. If somebody comes to see you and says, I'm here illegally, should I go back or is there something you can do for me? And he says, well, there's something you can do for me. Suppose he even says, well, I don't know there's anything I can do for you, but if I file X, Y, and Z, at least you can stay longer. Is that a crime? It is a crime, literally speaking, under this statute. Maybe they don't know enough about immigration law to know why you could stay longer if you filed X, Y, and Z. Well, asylum, withholding of removal, cat claims, cancellation. We know too much about immigration law. I've been here. Yes, there are many things you can do. And the person's still illegal while they're staying here and they still have a 20% or maybe less chance after getting any of that. And the advice may well be that you will hold off the deportation for five or six years, even if you eventually lose. Well, I would say not under a combination of the intent elements that this court has applied to the statute in the Cunard case. Cunard says that a doctor who merely advises a patient that medical marijuana might be beneficial doesn't have an intent to violate, hasn't aided and abetted any subsequent violation of the drug laws by the patient. Does that statute have the word encouraging it? No, but it didn't have to do with the statute. The federal government was investigating doctors who were advising patients to seek medical marijuana. And this court upheld an injunction saying that you couldn't investigate doctors, you could investigate them if they were engaging in aiding and abetting. But merely advising a patient about the availability of medical marijuana and explaining to them that you think that it would assist them doesn't demonstrate any kind of intent to aid and abet a criminal violation by them. And so I think the same would be true of any kind of legal advice. The hypothetical that Judge Reinhart asked at the last argument, if you just go in and talk to a lawyer and you say, well, you know,  And the lawyer says, well, you know, my advice is that they're not likely to come after you. Well, suppose he says, and I think you ought to stay here. But I still don't think under a combination of and the requirement that this court has imposed that the defendant intend to promote a violation of the immigration laws that that would be prosecutable. Well, what do you mean he intends, of course he intends to, intends that the client will violate the immigration law. By staying here, the client's violating the statute. That's it. Knopf says just the opposite. Knopf says if you say to your patient, I think you'd benefit from marijuana. It would be good for you. This would help you with your symptoms. But that is not, that doesn't demonstrate the kind of intent to aid and abet in a violation of the law that would allow the government. In other words, you'd be dealing with somebody, the lawyer presumably would be filing the pieces of paper that are helping them to do this. In other words, you stay here and when they come to try and deport you, I will file a cancellation of removal request for you. And he does. But it sounded to me before that you were saying that the cancellation of removal request is not effective. Well, it's effective a small percentage of the time. Meanwhile, he's here illegally and he's being encouraged to stay to let the process play out even if it doesn't work because in the meanwhile he can stay. I don't think that that would demonstrate an intent by the lawyer that the client violate the immigration law. What about a wife who says to her husband, you are the sole support of our family. I encourage you to stay here and be able to continue to support us. That doesn't come within the government's understanding because it doesn't provide the kind of assistance that we believe that the term encourage applies. This statute, the language encouraging the due states to 1952 and no case has ever been brought under this. No court has ever found that the government could bring a case that simply involves persuasion. All of the cases that we have brought involve some kind of assistance, some kind of significant inducement or assistance. And the wife says I will provide services to you while you're here including allowing you to live in this apartment which is registered in my name. Well, I think the question of whether allowing somebody to live in your apartment would be sufficient as a kind of inducement to remain is a tricky one. There is a Seventh Circuit case by Judge Posner that held that just allowing someone to live in your apartment, a woman let in. It's harboring, not encouraging. Right, but I don't think the analysis would be any different. Judge Posner held that allowing someone to stay in your apartment for two years was insufficient to constitute harboring. Well, unfortunately we don't have Judge Posner anymore. No, but I think that the question that you're asking would fall within the purview of the exception for de minimis. So the problem, I mean, the statute doesn't say assistance. It says encouraging, right? The ordinary use of the word encouraging certainly includes what Judge Reinhart was saying. I think it's a good idea for you to stay here. I encourage you to do that. That's a perfectly good use of the word encourage. Why should we think it's not the use of the word encourage in this statute? Because I think in the context of this statute when you look at this subsection of 1324 and you compare it to the other subsections of 1324, what you see is that the statute is aimed at actions. Actually, or at least arguably, it cuts in the other direction. Because all the actions are sitting here in the statute, what is it that we're talking about here with words that don't sound like you're talking about action other than things that aren't actions? But I think one meaning of encourage is to help. Another meaning of encourage is encourage. If somebody says to you, I encourage you to stay here, according to you, that would not be violating a law against encouraging you to stay here. That's right. But if you look at the cases that have been decided under this, all of those cases look at the question of whether what the defendant did was substantial enough to assist. That was the case. Well, we've been told that a prosecutor in the Henderson case in Massachusetts told the court that exactly the hypotheticals we've been coming up with do violate the statute. Well, they weren't exactly the hypotheticals because there are two things about Henderson. First of all, in Henderson, the defendant had employed the alien, so it was a mixture of employment and advice. But the advice was part of it. Part of what they said was the encouraging. But we charged both of them together. The encouragement was both of them together. But secondly, after the district court granted a new trial in that case for the failure of the jury instructions to include something like the de minimis requirement that I'm mentioning, the government filed a notice of appeal, which it ultimately dismissed and ultimately dismissed the entire case. So I don't think you can draw any lessons from Henderson about what the government's position is. Well, other than the language is open to that interpretation. It is open to that interpretation. By an in-good-faith person. Certainly. Including the United States government. But it's open to the interpretation that encourage just means persuade or to provide hope. Doesn't that chill speech? No, I don't think so. When it's open to that interpretation and people think that's what it means, that's enough to chill speech because they don't want to violate the law and be felons because they said to somebody, I encourage you to do this. So if you take a look at the Williams case, that's the case that had to do with transactions and child pornography. And there was an over-breath argument in that. And that was one of the cases that had a string of verbs. And one of them was promote. It was unlawful to promote child pornography. The Supreme Court said in the context of that case, promote could mean a lot of things. Sure. It has a number of different meanings. It doesn't have a string of words. It only has two words. Encourage or induce. They both have the same problem. And we're taking the most likely meaning of encourage. Encourage. I don't think so. Judge Reinhardt, if you look at the case law, you will see that the way this has been interpreted in the cases is to mean to help. The case law under this provision. I don't know why they didn't say help instead of encourage if that's what they meant. If they didn't mean encourage, why did they say encourage? But help is one recognized meaning of encourage. And in a number of cases, Del Rio, Lopez. Ms. Collery, you think it's open to us in this case to define what encourage means in the statute? Yes. All right. What is the definition? I think encourage means to assist or facilitate or to purport to assist or facilitate. You sort of repeat something you said earlier, which I didn't get out of your papers, that encourage must include some kind of assistance. Or purporting to assist. In this case, she didn't actually assist anyone. We didn't have that. That qualification wasn't in the jury instructions here, was it, in our case? No, the jury instructions did not define encourage. All right. So that's one of the reasons. Now, you think that would cure the overbreath attack? I do. I do. But I need to get on to Judge Burr's one. I think it cures the overbreath attack because it limits the statute to effectively conduct the aids and abets. So you would say that it doesn't go to pure speech? No, it doesn't. You have to actually do something. You have to do something. Conduct. Right. All right. You said that in your brief and then you quoted a bunch of, in your supplemental brief, and then you quoted cases that seem to say something else. It's very, you know, slippery slope-ish stuff because the examples you were using, let's see if I can find the, go ahead. How does the statute do more than, you know, Section 2, the aiding and abetting statute? Why would you charge under this when you could? No, no, no. If we define encourage to require some kind of assistance, how is it different from aiding and abetting? Well, it's different. It's slightly different from aiding and abetting because under this statute, just encouraging, like assisting or offering to assist someone suffices. And it doesn't, you don't have to also prove that they actually did remain in the United States. So it's slightly different from aiding and abetting. But this is. It's closer to solicitation. No, because solicitation just involves saying, you know, why don't you do that? Whereas aiding and abetting involves actually providing some kind of assistance. This court has a wealth of cases that establish that aiding and abetting in criminal violations are, is not protected speech. Cases involving, for example, someone who types up a list of instructions on how to make illegal drugs, that is not protected speech. Or someone who creates, does seminars in which they explain to you how to defraud the United States on your taxes. That's not protected speech. So to the extent that the statute is limited to aiding and abetting violations of law in the United States, it does not trench on protected speech. Now, there's the point that Judge Berzon made and that the defendants made, that you can violate the provision remain in the United States without engaging in a crime. And in that sense, it's broader than aiding and abetting. Because we're talking here, many of the violations involve aiding and abetting criminal conduct. But if someone. But most of them don't. And this case didn't, for example. This case didn't. But many of them would. I mean, many of the things the statute covers would involve criminal conduct. But I concede that in this case and in some cases, if someone just overstayed their visa, for example, it would not involve criminal conduct. But. And I note that the amici appearing on your behalf was adamant about the fact that if it's aiding and abetting, you can't aid and abet a non-criminal statute. No. What he said was you couldn't solicit. He was talking about solicitation. He was assuming the statute doesn't apply, but it does apply. It would be a problem if it applied, but it does apply. There's no doubt that it applies. I'm not sure what you mean by it applies. The statute definitely applies to non-criminal behavior. Yes. In our view, and I think amici agree with us, you have to be here in violation of law. And some people are here in violation of the law. And that's. And you would not support a limitation that took that out. I don't. And I'd like to point out that that limitation is not just in this provision, but it's also in two and three. Right. And we don't support a limitation that takes that out. So let me explain why. First of all, I think that the plain error standard clearly applies here. This is an over-breath argument that wasn't raised before. And I think that if you look at the Williams case and read its discussion of Pittsburgh Press, together those two cases make clear that if you aid and abet civil violations, that conduct is not protected speech. In Pittsburgh Press, the underlying misconduct was sex discrimination in employment. And the newspaper was aiding and abetting the sex discrimination in employment by publishing advertisements for employment that had female and male columns. The court considered first whether that was commercial speech. But then Pittsburgh Press said, well, we don't think that this should be treated as commercial speech. We think it should be treated as regular speech. And the court said, regardless. It doesn't matter whether you treat it as commercial speech or not commercial speech. At that point, commercial speech was not covered at all. Is that right? I think the restrictions on the First Amendment protection afforded to commercial speech was much less at that time. Well, it was before Central Hudson. Yes. Right. And so Pittsburgh Press was saying, you should decide Central Hudson. You should give more protection to commercial speech. In fact, they were saying you should give the same. And the Supreme Court said, we don't need to decide that because this isn't protected at all. This is an offer to engage in illegal transaction. And that's not what's in the statute. The statute doesn't have anything to do or certainly isn't limited to offers to engage in criminal behavior. But it's illegal. In Pittsburgh Press, what the underlying illegality was civil. It's not an offer. It's not a transactional, limited to transactional speech. There's nothing in the statute that is limited to transactional speech, is it? No. Not at all. So how is it relevant then? Because Pittsburgh Press said it doesn't matter whether it's commercial speech or not. Put that to one side. This is an offer to engage in an illegal transaction, and that speech is not protected. And then if you go look at Williams, the number one case that Williams relies on is Pittsburgh Press. Williams specifically says that offers to engage in illegal transactions, not criminal transactions, but illegal transactions have no protection under the First Amendment. And the case that it cites in support of that is Pittsburgh Press. And if you look at those offers to engage in illegal or an illegal transaction, it's not a transaction. If somebody gives somebody advice. No, but it's to say Pittsburgh Press didn't actually involve a transaction either. What it involved was published an ad for a transaction. Right. Was the newspaper aiding and abetting the employer's illegal employment discrimination. So the employer was engaging in civil misconduct, and the newspaper was aiding and abetting it. And the Supreme Court said that's not protected whether it's commercial speech or not commercial speech because you can't assist in this illegal transaction, which was a civil transaction, which was civilly unlawful. And then if you go look at Williams, Williams involved child pornography. So the underlying misconduct was criminal. But Williams specifically uses offers to engage in illegal transactions. And the reason why they do that is because they're relying on Pittsburgh Press, which involves civil misconduct. So if you read those two cases together, I think they clearly demonstrate that offers or aiding and abetting or offering to engage in illegal transactions, even if they are civil, is unprotected activity under the First Amendment. But it's not an offer to engage in an illegal transaction. It may be advice about which results in illegal, to continue engaging in illegal activity. But it's not itself transactional. I think they're equivalent. Aiding and abetting an illegal transaction and offering to assist someone to engage in one. You're putting your assistant there, which is not in the statute. Assistant in a non-speech sense. But the newspaper in Pittsburgh Press was the one that was enjoined. And what the newspaper was doing, there was a regulation that said it's unlawful to assist in sex discrimination. And what the newspaper was doing was assisting the employer in sex discrimination. And I think the offer language has come in because Williams itself involved offers with child pornography. But the fundamental principle is that whether you're offering to do it or whether you're assisting in doing it, there's no distinction between cases where the underlying illegality that you're offering to engage in or that you're assisting is civil or criminal. I concede that there's not a lot of law on this, but I do think this is where the plain error standard comes in. The burden is heavily on the amici here to prove that a statute that criminalizes aiding and abetting civil immigration violations, if you do that through speech, that that speech is protected. When the lawyer on the other side started off with the fact that you were arguing for an aiding and abetting statute, I thought he was wrong, but it turns out he's right. In other words, I didn't know where that came from. I didn't know that you used the language in your brief. This doesn't read like an aiding and abetting statute, does it? It doesn't say you have to aid or abet anything. You just have to encourage it. I don't agree with that. If you look at the Altamirano case, which we cited, this was a case involving a similar immigration statute. The language is somewhat different, but it has encouraged. It was anyone who knowingly encouraged, induced, assisted, aided, abetted any other alien. But it has the encouraging language, and this court in that case said that it required an affirmative act of assistance. What was he being prosecuted for, encouraging such and such aiding or assisting? He was being prosecuted for aiding and assisting that had required aiding or assisting. It was a case about whether someone could properly be rendered inadmissible for coming to the border with an alien concealed in the car. And the person said, I didn't do anything. I'm just there. The person's concealed in my car. I didn't do anything. And this court said, yes, that's not sufficient under this statute because it requires affirmative acts of assistance. And the same is true of the vast majority of cases actually interpreting this statute. This is not something that we've pulled out of a hat. This is the way we have always charged this statute. Someone said earlier that you had eight different things you were adding to the statute. My understanding is, A, you're adding, you're essentially adding some kind of an act instead of speech requirement. You're adding this notion that it has to be specific individuals. You're adding the non-de minimis thing, your notion. What else? What else that's not in terms there? I think they're all there. I don't think we're adding those things. I think if you read the case law, you will see that our interpretation of what it means to encourage and induce is the way we have charged this statute and the way the courts have understood it. The vast majority of cases interpreting this statute define encouraged to mean to help or to assist. And admittedly, some of them, including the Thumb case from this court, go much broader and have this other language about inspire to hope. But no case has ever applied that. And that's an insubstantial basis on which to strike down an act of Congress as unconstitutional. If that language sweeps too broadly, and we think it does, this court should simply say so. It should simply confine the statute to the core that the government has always charged and that the cases have always acknowledged, which is assisting and helping or, in the case of Ms. Smith, appearing to assist or help in order to induce someone to remain in the United States. Do you mean by that that speech alone is not enough? Is that what you mean by it? That help means that you can't do it just by getting up. We have various examples. If the university president gets up and says, we'll do everything we can to help you stay here, that can't be a crime. And don't leave. We're going to do everything we can to help you stay here, undocumented students. Yes, I don't think that that's a crime. Including waiving tuition. Well, I think if the school waived tuition and had a program that only waived tuition for people who were here as undocumented aliens, but not for anyone else, that would potentially be a problem. And there are schools that are doing that right now. I mean, there are. I doubt that there are special programs for people who are in some danger of being asked to leave for that reason or told or made to leave. But I doubt that they, I don't know enough about the programs to say, but I doubt that they have programs that are limited only to somebody else, but it's because they're undocumented aliens that they're waiving it for them. But there are, as we said in our brief, if you're offering charity or you're offering assistance to people on a generalized basis, then that doesn't constitute aiding them. I'm going to give free legal advice to anybody who's being threatened with deportation. I don't think that legal advice, I don't think that under the conundrum. It's a free part. You can come in here, you don't have to pay me. We're a charity. There are all kinds of organizations that do this. We're going to have free legal advice for people who are being, who are getting notices to appear or can be deported. Free legal advice only to people who, we offer this as a. There are lots of organizations that do that. I think that's a hard case. Really? Well, then there are an awful lot of people who are in trouble. Well, I'm not sure. I don't know that there are charities out there that are offering their services only to people who are here illegally. We will not help you if you are here illegally. If you're following the law, forget it. We only offer free legal advice to various groups of people. Yours is one of the groups that we offer free legal advice to. I think that's fine. I think that's just like a grocery store that offers groceries. As a matter of fact, for example, there are groups that go to detention centers. I mean, it would be nice if the prosecutors had some idea of what's actually out there. There are organizations whose purpose is to provide legal assistance to people in detention who the government is right now trying to deport. That is what they do. All right? And they go in there and they don't charge them and they go in there and they give them advice. And some of the advice might well be of the kind I was saying before. That is, I don't know that I'm ultimately going to succeed, but you have a credible asylum case here. We at least make it so that you won't go anywhere for a while. All right? And that's what they do. They don't do it for other people. So then what? I'd have to know more about that case. But let me say that if the court thinks there are problems relating to legal advice, then the proper result here would be to create some kind of limited First Amendment exception to the statute for lawyers. I think it would be, that would also be... Oh, but not necessarily lawyers. Many of them are not lawyers. Well, for provision of legal advice. I think it would be wrong to strike down this statute as overbroad and unconstitutional because of the concern about the provision of legal advice alone. And I think as Professor Volokh pointed out... We've talked about universities, for instance. We've talked about families. There are a number of groups that do provide, that encourage people to stay in the United States, even though they've overstayed their visas, they haven't committed a crime, but they're here, and they advise them not to leave, they advise them to stay here, and they encourage them to stay here. Probably all the DACA people either fall in that category now or shortly will. And a lot of people will advise them to stay here in case Congress comes to its senses. I don't think that's covered by the statute. Just, you should stay here. We think you belong here. None of that is covered by the statute. And not only that, I'll give you a job. And not only that, I'll... Well, jobs, that's their own problem because they have a separate statute. But I will, you know, let you stay in my university even if you no longer can work. I will, and so on and so on. I think that the problem would arise only if they were providing substantial assistance of sufficient nature that would actually make a difference in whether someone stayed. And they did that only to people who were here illegally and didn't offer it to other people. They say, I have a program exclusively for you just because you're here illegally. I don't really understand why that matters, actually, as long as it includes them. Yes, well, I think it does because services and goods that are offered to the general public on equal terms don't constitute encouraging and inducing. They're offered to various groups of people, including aliens who are here without having a right to be here. That's one of the groups. But they also have a heart for homeless people, for instance, and others who are oppressed or who are of some kind of disadvantage. And one of those groups, they feel, are the people who have overstayed. Well, I also don't think those examples probably don't satisfy the intent requirement that this court put forth in the OSHEDA. That is that they would have to, any prosecution would have to show that that was done by the university with an intent to cause the person to remain here illegally. Well, to help them remain here, yes. It's done because they want to help them remain here. And they say it quite openly at the universities. And a lot of people don't know whether it's a good thing for them to stay here or to leave and maybe not be able to come back for 20 years until they get on another list. And a lot of people think that's unjust and want to encourage them to stay here. Encourage is the word because that's what encourage means to me. I mean, I must say that the whole idea of taking a word whose primary meaning to most average people is encourage means I urge you to do something, I think you ought to do it. That's what encourage is the basic meaning of it. You can find a lot of other meanings. But to say that that's the one thing it doesn't mean, what its primary meaning is, just doesn't make any sense to me. I think there are numerous meanings. It's no different from the word. No, but that's the primary meaning. You said to the average person, what does encourage mean? It means you say to somebody, I think you ought to do this. That's what encourage is. That's the normal meaning to the average person of encourage. I think in the criminal context it may be different. When we use the word encourage, particularly next to the word induce, and in a statute like this that's talking about, you know, have the subsection 1, 2, and 3, all of which involve conduct and action. I think it's appropriate to assign it a different meaning. The same way in Williams, the Supreme Court assigned to the word promote. You might think promote means to speak well of. But in Williams, the Supreme Court assigned to the word promote the intent to engage in a transaction. It wasn't the only meaning, but it was the meaning that the court thought made sense in context. And I think the same is true here of encourage. But see, if you're talking about discouraging people from exercising First Amendment rights, it's somewhat different, I think. That goes to what the people who might like to help other people are afraid that they can't do it, because one of the primary meanings, if not the primary meaning, is they'd be encouraging people. And therefore, they wouldn't exercise that right. But because the statute doesn't mean that, and because the case law, if you look at it carefully, doesn't mean that, I don't think that's a problem. But if the court thinks that it's a problem, the proper solution is to write an opinion that explains what encourage means in this circumstance. Overbreadth is strong medicine, as the Supreme Court has said. And the court does have a duty to avoid striking a statute down on overbreadth grounds when it can interpret it in such a way that the statute is constitutional. And there's no question that the interpretation that we are setting forth is a reasonable meaning of encourage. In fact, it's the one that appears most often. Let me ask you one other question. Last question. Okay, about the meaning. Does it matter whether the person actually stays? In other words, does there have to be an actual – does it have to succeed? There is some suggestion in some of the case law and in some of the briefs that another limitation might be in some context. For example, in aiding and abetting, you can only aid and abet an actual crime, right? So in this instance, you have to – does it matter whether your advice is taken? No. It doesn't. The statute does not require that. It has to be, as we say, non-de minimis, by which I mean it has to be capable of influencing the person's actions. But it doesn't have to influence. But it doesn't have to influence, although certainly not under encourage. I think there is case law that suggests that the word induce actually requires that someone do something. I think encourage does not. There's case law that says that induce does. This court in a case called DINGA, which involved a statute that involved inducing minors to engage in sexual activity, interpreted the word induce to not require that someone actually do something. But there are some cases suggesting that induce does require that. But I don't think encourage has that requirement. Thank you very much. Thank you very much. All right. We will give the final speaker the floor. Whomever that may be. Yes, Your Honor. I was going to start by saying I apologize. It could not be this fine. You only have 27 minutes to match the time your opponent has got. That's kind, Your Honor. And also Mr. Cook, party counsel, has ceded his rebuttal time to me as well. So I'll be here. No, that's still good. That's totally fine. Okay. Good morning, Your Honors. My name is Lee Roland with the ACLU here on behalf of Alamiki. I think the government's argument actually makes perhaps a better argument than we could as to why this is the perfect case for the court to consider facial invalidation and furthermore to strike down the statute as facially unconstitutional. I just want to hit a few of the points that counsel just touched on. First, it is clear from the government's argument that their interpretation of this rule, which is subjective, is based on a series of atextual limitations that appear nowhere in the text or legislative history of this statute. While counsel cited the law correctly, it bears literally no relation to the actual text of this statute, which is predicated entirely on two verbs. And as the court has noticed, these two verbs include encouragements not only of criminal activity but civil activity. I think the first and most important point to note is that the government appears to now have settled on an aiding and abetting theory. Under Hornbook law in this circuit, aiding and abetting requires a completed crime. As counsel just told this court, the government's interpretation requires neither a crime nor a completion of any kind. So it is fundamentally an apposite as a doctrine to apply to this statute. If that weren't enough, it's also clear that this court has stated in cases like Sanchez-Vargas that the one congressional intent that is clear behind subsection A1 is that there should not be redundant charges under this section. But sub 5 actually already addresses aiding and abetting liability for the prior two sections that appear above it,  so it's actually difficult to even identify the kind of conduct that might be included in an aiding and abetting rationale that is criminal, that is completed, and is not totally and wholly redundant to the other subsections here. It simply doesn't exist. And I think it's important to remind... It wouldn't be wholly redundant if it did not require a completed crime, right? Well, it depends, Your Honor. Why does it depend? Because it's based on the government's representation. And I think it bears repeating that it is the government's burden to demonstrate that this is a narrowly tailored law because it's a content-based criminal prohibition on speech. For example, the Supreme Court in Skilling did a fairly severe rewrite of the statute, but it didn't have a First Amendment piece, or at least that wasn't... So is that the key point here? I think the court has shown... If it wasn't threatening speech, chilling speech, maybe we would do this. I mean, it might make more sense in some ways, but it would take six or seven different fixes. I think that's exactly right. And as Mr. Fleming began with, we're talking about radical surgery. And I think unlike, say, the Skilling case, if we look at other cases where the Supreme Court has addressed overbroad laws impacting speech, there are two themes that emerge. Number one, the court has a duty to consider the chill on third parties not before the court in this case. And although defendant here did absolutely brief and raise the First Amendment issues, amici are here collectively to tell you that they are objectively chilled by the breadth of this law in providing counsel to people ensnared in a matter not only of immense political importance and debate in the country... I don't think you're particularly chilled. I think you're talking about doing your duty. That's true, and I think all of the counsel and amici here are here to ensure that we can do that duty without running afoul of a felony prosecution and land in the pen for five to ten years. Have you... I mean, there was the Henderson case. Other than that, has there been... And there is some statement by Secretary... by Attorney General Sessions that's referenced in one of the briefs. But is there any actual indication in those two things that anything like we're afraid of is happening or would happen? Yes, Your Honor. Well, first of all, I think it is important to highlight the actual government position in the Henderson case, which I think was not totally accurately represented during this argument. The government did explicitly... I am reading from the court's opinion, takes the position that giving illegal aliens advice to remain in the United States while their status is disputed constitutes slowness conduct. The government made the explicit argument that separately or together, the speech activity was itself enough to satisfy the criminal prohibition. Separately, I would point the court to the government's opening brief in this case, where it wrote, and I quote, the theory of liability against Ms. Simoning-Smith was that she, quote, inspired hope, end quote, or, quote, influenced the position, end quote, of her clients. That's on the government's opening brief on page 23. So not only is the government's position... But she didn't do it purely by speech. In this case, it was the signing of the retainer, I believe, which is what the record reflects, is the entirety of the predicate offense. Did she do certain things which involved filing documents with the government? She may have done so, but of course, Your Honour, that requirement of assistance of an actual act outside of speech appears nowhere in this statute. And I think the government's changing position, not only in this case, but in the various cases where they have, very vehemently asserted the right to use this crime against speech. I would also combine that with the amicus curiae brief filed by the city of San Francisco, noting that city officials have been threatened by DOJ with potential violations or charges under 1324. She reminded the court that the chill here is real, that whether or not the government has sought to bring that kind of stand-alone charge against speech outside of the Henderson case, where it absolutely did, and the court was having none of it, fortunately, but what this amounts to is an argument by the government that we rely on their prosecutorial discretion in applying this statute. That is, in fact, what the Supreme Court has said in cases involving speech, the government and the Constitution cannot do, that the Constitution does not permit. For example, in the Stevens case, the court was very sensitive, not only to the chill on the parties, but on the fact that the over-breath actually directly caused that chill and refused Judge Berzon, like you mentioned in Skilling, to rewrite the statute in part for that reason. Because the statute on the books broadly included a lot of protected speech that dwarfed its application to actual criminal activity that could be prescribed. And when we're dealing with verbs that Judge Reinhart, as you eloquently, and I think in common sense, stated, we're dealing with verbs that every person believes on first blush describe pure speech, right? Encourage, induce. The courts have a long list of interpreting those statutes. And the only cases in which those words have been found to have stand-alone valence are when they are in a list of verbs that gives this court context on how to interpret that consistent with the legislative history. Here, there is no such scaffolding. And Judge Berzon, I see my time is up. If I might, I'd like to add one point to a question you asked earlier that I believe went unanswered. Which is, you asked if there were cases... I'm happy to attempt it, Your Honor. That shouldn't be so hard. No. But I think that whether or not courts have found that the words encourage or induce stand-alone have been unconstitutional, and the answer is yes. Where that verb has been more attenuated from the actual crime, a great case to look at is a state case, a Minnesota Supreme Court case called Melker-Dinkel, which we cite in our brief, about encouraging others to commit suicide. In addition, the D.C. Circuit overturned an injunction that prevented the National Organization for Women from encouraging or inducing trespass. And the court said that was an intolerable limitation on speech. And here, where we're talking about an area that is not simply criminal, but includes civil violations, which is an inherently fluid and complex status, which this panel knows as well as anyone on the planet, the idea that we rely on the government's noblesse oblige not to bring charges against those who express their opinions about a matter of immense public concern or seek to aid or advocate for those within their own realm of duty is astounding. And there is no case in the Supreme Court that would support this traumatic rewrite of that statute to mean something other than it plainly does, which is a criminal prohibition on pure speech. Thank you, Kirsten. Thank you. Thank you all, the outnumbered as well as the amici. Very informative, an excellent argument on both sides. And we will go to delivery. The court will stand in recess. All rise.
judges: Reinhardt, Tashima, Berzon